"EXHIBIT 1"

REQUEST TO WARDEN OF FCI ENGLEWOOD

FOR SENTENCE REDUCTION ("COMPASSIONATE RELEASE")

18 U.S.C. §3582(c)(1)(A)(i), U.S.S.G. §1B1.13(b)(3 & 5),

& BOP PS 5050.50(5)

Submitted by James M. Cameron, Reg. No. 11343-036

---

(1) <u>Introduction</u>

I hereby request that I be granted a sentence reduction pursuant to 18 U.S.C. §3582(c)(1)(A)(i) and U.S.S.G. §1B1.13(b)(3 & 5) because the following extraordinary and compelling circumstances exist:

(a) My family circumstances, particularly my need to take part in the care of my son, D.C. who is a person with autism;

(b) The harsher than contemplated conditions that I experienced at FCI Englewood during the COVID-19 pandemic; and

(c) My post-conviction rehabilitation.

(2) <u>Legal Standard</u>

Ever since November 1, 2024, the U.S. Sentencing Guidelines (U.S.S.G.) provide that the "extraordinary and compelling" circumstances which may result in a sentence reduction under 18 U.S.C. §3582(c) include the following:

(a) "The incapacitation of the caregiver of the defendant's child who is 18 years or older and incapable of self-care

- 1 -

because of a mental or physical disability or a medical condition" (U.S.S.G. §1B1.13(b)(3)(A)); or

(b) "The defendant presents any other circumstances or combination of circumstances that, when considered by themselves or together with any of the reasons described in [paragraph 3], are similar in gravity to those described in [paragraph 3]" (§1B1.13(b)(5)). This is the so-called "Other Reasons" provision.

The U.S. Sentencing Commission ("U.S.S.C.") "considered but specifically rejected a requirement that 'other reasons' be similar in <u>nature and consequences</u> to the specified reasons." <u>See</u> Nov. 1, 2023 Amendments to U.S.S.G., p. 10, (quoting First Step Act §603(b)) (emphasis added). "Rather, they need be similar only in <u>gravity</u>...." <u>Id</u>.

On other words, the totality of the circumstances must be considered without limitation to the nature of the reasons cited by the inamte, including rehabilitation, since "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted" (§1B1.13(d)).

Also, unlike the previous version of the Guidelines, now the the "extraordinary and compelling reason need not have been unforseen at the time of sentencing in order to warrant a reduction in the term of imprisonment" (§1B1.13(e)).

In addition, the BOP Program Statement providing guidance in compassionate release applications notes that "in reviewing

- 2 -

these requests, BOP should assess, based on the information provided, whether release of the inmate to care for the inmate's child is in the best interest of the child." PS 5050.50(5).

(3) <u>Impact of Early Release on Total Sentence</u>

My current projected release date is May 16, 2025. As of July 16, 2024, I will have completed over 94% of my total sentence (including good time credits). By the time the District Court can realistically be expected to act on any motion based on this request, an early release on that date would result in no more than a 10-month reduction of sentence, as I will have served over 160 months of the total of just over 170 months (including good time). My total sentence of 196 months (not including good time) consisted of an initial sentence of 165 month on Case No. 09-cr-00024, and a consecutive sentence of 24 months on Case No. 13-cr-00001 (contempt of court). Although the BOP aggregates sentences such as these for administrative purposes, given that the intial sentence of 165 months on No. 09-cr-00024 has (after consideration of good time) already been fully served, this request for sentence reduction will only concern the consecutive 24-months sentence on the contempt of court conviction.

My internal BOP paperwork for me to be transferred to the halfway house in Portland, Maine has been submitted twice, and both times it was rejected by the Regional Reentry Coordinator's office due to clerical errors by the Case Managers here at FCI Englewood. The first submission was made on February 11, 2024, and I am told that my paperwork needs to be submitted a third

time, which has not happened yet. Afterward, it will have to be approved by various levels of BOP staff before it can be finally apporved and a date set for my halfway house transfer. This approval process previously took eight weeks. In any event, no beds are currently available at the halfway house until November, 2024. By the time my paperwork is finalized in 1-2 months, it is likely that this earliest possible date will be pushed to early 2025. In short, halfway house is not a realistic solution to my immediate extraordinary and compelling circumstances. Furthermore, residing at a halfway house will not alleviate my current family situation as described in the next section of this request.

(4) Family Circumstances

My son, D.C., is 29 years old and has Autism and Obsessive Compulsive Disorder. He has had these conditions since birth, and was first diagnosed as a very young child. When I was sentenced on December 17, 2014, Doug was 19 years old and exhibited many of the same behavioral problems as today, although their impact was slightly less. The current situation is described in the attached Letter from B.C., my ex-wife and D.C.'s mother and full-time caregiver. ("Appendix A").

B.C.'s letter demonstrates the extreme hardship she suffers every day as D.C.'s sole caregiver at her home in Hallowell, Maine. Her decade as a single mother of a son with Autism has taken a terrific toll on her and has now become a crisis.

- 4 -

As she describes in her letter:

> Maintaining his case on my own with no real respite leaves me exhausted and burned out. I need assistance in D.C.'s care from someone who understands D.C.'s needs and can manage his behavioral issues with love and compassion. Jim's release would provide me with relief from the psychological toll placed on me.

She also describes the physical consequences of being D.C's sole caregiver:

> My son's needs are both physical and behavioral. His OCD often manifests itself as unreasonable, impossible demands of those around him. I have worked with him for years on strategies to contain his anger, but [his] gaining the insight required to do this is a near impossible task for someone with Autism. He can become angry quickly if denied his "orders." When this anger turns into a physical altercation, he has blocked me in my room, pushed me down stairs, and shoved me against the walls. D.C is 5'10", 260 lbs and I am 5'1", 105 lbs.
>
> I desperately need an alternative caregiver to take some of the burden off me. Having Jim nearby could provide me with breaks during the week or even time away.

I should be added that B.C. is 62 years old. She manages to provide excellent care under the circumstances, but her ability to continue to do so is at the breaking point. We have discussed whether it is necessary to place D.C. in a institutional setting several times in recent years, although the expectation of my getting out of prison has given us hope that this will not be necessary. In any event, few if any such placement options are available in Maine.

B.C.'s twin sister N.M. and her husband, D.M., have also written a letter supporting B.C.'s request that I be released to provide care for D.C. See "Appendix B," attached.

As they explain:

> A child when James was first incarcerated, D.C. has now grown into a 29-year-old man who challenges his mother both mentally and physically. While B.C. has coped well over the past ten years, their son now outweighs her by more than 150 pounds. He is easily upset by issues large and small and can become physically aggressive with her.

Although B.C. is committed to keeping D.C. out of an institutional placement, the status quo cannot continue. D.M.'s letter continues:

> B.C. is a patient and loving mother and cares for D.C. in her home, but she now badly needs the respite that only D.C.'s father can provide.

Furthermore, there are no other family members or other persons who can provide the needed care for D.C. other than myself. My 32-year-old daughter E.C. -- D.C.'s sister -- lives in Hartford, Connecticut and is too far away to provide care. As D.M. writes, "N.M. and I have been able to offer [B.C.] some relief over the years, but D.C.'s size and violent behavior no longer make that possible for either of us." B.C. also writes, "The only caregiver available has been my sister, but as she ages, she no longer feels able to manage D.C." (Appendix A).

D.C. spends part of each weekday at a program for mentally disabled adults in Augusta, and generally does well. But this provides no respite for B.C. as she works full time. She is with D.C. day and night and literally has no time away from him other than while at work. Desides the stress that this causes B.C., I believe it exacerbates D.C.'s behavior problems to be with B.C. constantly. D.M. comments, "D.C

- 6 -

speaks of James often and has been looking forward to his father's return. N.M. and I are confident that James will be a positive influence in his son's life and that his visits will provide B.C. with much needed help at this time." (Appendix B).

    D.C. has also been diagnosed with Type II diabetes fairly recently. This is undoubtedly the result of his obesity that has afflicted him for many years. His Autism seems to adversely affect his stomach's ability to feel full. B.C. struggles with his diet, but even after years of great effort, his eating habits remain problematic. B.C. and I have discussed various treatment options for him, as well as a strategy for exposing D.C. to more healthy eating habits when he is visiting me. I know that I can provide somewhat more food discipline if I can spend time with D.C. in an environment that is new to him. He is very much a creature of habit, and a change of environment may be able to help him overcome some bad eating habits.

    If I am granted a sentence reduction, D.C. can gradually get comfortable being with me on weekends in Portland, which will broaden his social and environmental horizons considerably. Spending time in a vibrant city instead of his familiar Hallowell and Augusta will cause him to learn new coping mechanisms and social scripting. This is critical for persons with Autism. B.C. writes:

> Having Jim nearby would also benefit D.C. Jim and D.C. have a close relationship and D.C. regularly asks when he will be able to see his Dad. I know that having regular visits with his father would provide healthy socialization and cameraderie so needed by people with Autism. D.C. has virtually no social network and is quite

>  isolated. Having access to his father would enable
>  D.C. to have access to this other loving adult
>  in his life which would have a profound impact
>  on D.C.'s feelings of security and wellbeing. I
>  believe that Jim will be a devoted, loving, and
>  responsible presence in D.C.'s life. (Appendix A).

In conclusion, B.C. is incapable of continuing to provide necessary care for my adult son D.C. without jeopardizing her own health and wellbeing. There are no other persons available to serve in this necessary caregiving capacity. If released from incarceration, I would be able to care for D.C. and this will ameliorate both his and B.C.'s problems. My ex-wife's situation with D.C. meets the criteria for compassionate release in U.S.S.G. §1B1.13(b)(3), or "is similar in gravity" to this criteria (§1B1.13(b)(5)) so as to by itself or in combination with other reasons described in this request constitute an extraordinary and compelling set of circumstances that justify a 10-month sentence reduction on a 196-month sentence.

(5) <u>Rehabilitation</u>

I have successfully completed two intensive programs while incarcerated. First, I completed the 9-month BOP Residential Drug Abuse Program (RDAP) on 7/23/2015. During this period I was elected by my peers and by the RDAP staff to act as a mentor to the other inmates in the program as a "Big Brother" and a "Senior Guide." I have not been able to complete the "TDAT" 4-month outpatient portion of the program, which is required for overall program completion, but the Portland TDAT program accepts Probation referrals, so I can complete it

- 8 -

as well as any other ongoing substance abuse or sex offender treatment required by my probation officer, if this motion is granted. I do not currently qualify for the early release provisions of 18 U.S.C. §3621.

Besides the RDAP program, I have also completed a course in Victim Impact and Sexual Self Regulation through the psychology department. In addition, I have completed a variety of Release Preparation (RPP) and Adult Continuing Education (ACE) classes through the education department. I also organized and taught Toast Masters (which met for two hours weekly for a year), and have taught Job Preparation many times. My job assignments have primarily involved working in Education or the Law Library, helping other inmates.

The second intensive program I completed was a 32 credit-hour college certificate program in Christian Leadership that is roughly equivalent to a one-to-two year seminary program. Completion of this course took four years and about 640 hours of classroom time and homework. Since my graduation from it in May, 2019, I have continued to serve as a mentor for new students and I spend at least 3 hours per week both in and out of class helping other students in the program. My participation has therefore lasted from 2015 to the present, over 9 years. See Letter from Chaplain Kris Briggs, TUMI of Colorado, attached as "Appendix C." As she describes in her letter, this is a national program that is run by the non-denominational non-profit organization, The Urban Ministry Institute. I intend to work with a local church in Portland, Maine to offer this program to adults

- 9 -

in the Portland area when I am released, hopefully soon pursuant to this request.

After spending hundreds of hours in the weekly classroom portion of the program over the past nine years, Chaplain Briggs is in a good position to evaluate my personal growth during that time. As she comments in her letter:

> Over the nine years that I have known Mr. Cameron, I have witnessed a definite transformation of his character in to a mature, humble, godly man. As a TUMI mentor, he has exhibited caring leadership qualities among the TUMI students, always finding ways to help them succeed. He is highly valued by the TUMI Mentor team and also highly respected by the current students.
>
> In conclusion, knowing James all these years, I can confidently recommend him for early release. (Appendix C, p. 2).

During the time I have been involved with the TUMI volunteers, I have had many opportunities to share with them the remorse I feel for my crimes and the impact it is having on my family. Another volunteer who participates in TUMI has also contributed a letter in support of my request. See Letter from Melanie D. West, May 23, 2024, attached as "Appendix D." In this letter she states: "He is respectful, intelligent, hard-working and caring for those currently in the class, working diligently to complete the course. I know his family has been devastated by the setback of his release, especially his autistic son." Mrs. West has known me for five years.

Finally, the outside mentor that I have spent the most time speaking with on a one-to-one basis is Steve Farson, who has also contributed a letter in support of this request.

- 10 -

See Letter from Steve Farson, May 30, 2024, attached as "Appendix E." In it he states:

> It can be noted that nine years of active side-by-side instruction and leadership does reveal, and clearly so, how one's character, commitment, and trustworthiness is shaped. It also reveals one's heart, and the extent one begins to shift towards the greater interest of seeing others grow and develop versus the assessment of the self only.
>
> In all the preceeding, Mr. Cameron possesses a steady yet heartfelt commitment to seeing others grow and thrive. Nine years has revealed he doesn't waiver or stray from this desire. Additionally, this intent has resulted in numerous students graduating successfully from this involved curriculum.
>
> This interest in the well-being of fellow inmates and students extend also to his family outside the walls of FCI-E. He has an autistic son he has mentioned to me, and his ex-wife needs care in Maine. (Exhibit E).

Finally, my risk of recidivism has been evaluated by the BOP's new PATTERN diagnostic tool, and I have been rated as having a "minimum" risk. Chaplain Brigg's following comment is also relevant: "Statistics show the recidivism rate is reduced to 6% for TUMI incarcerated students who have attended at least four TUMI modules." (Appendix C, p. 1). I have completed 16 modules and attended another 16 as a mentor. My risk to public safety is nil, and no other 18 U.S.C. §3553(a) sentencing factors militate against my release.

(6) Conditions of Confinement During the COVID Pandemic

From April 1, 2020 to approximately March, 2021, I was completely locked down in the North Range of the Lower East housing unit at FCI Englewood. This was an unsuccessful attempt

- 11 -

by FCI staff to prevent the spread of COVID-19. The housing unit consists of three hallways, and the North Range hallway where I was housed consists of 31 two-man cells. For about three weeks at the beginning of the lockdown we had no opportunity to use the telephones or TRULINCS "email" messaging system to contact anyone outside the facility, such as family and friends. Eventually, access was allowed to these methods of communication for 10-15 minutes per day. All the rest of the time we were locked into the range. All meals were delivered in foam "take-out" containers, and consisted of about 1/2 of the usual portions. No access to the outdoors, let alone the exercise yard, was allowed. No access to either the general or law libraries was allowed and all education programming was suspended. There were no chapel services or activities, with the exception that the Chaplain did visit the ranges from time to time; for example, to deliver self-contained communion kits once a month. All inmate work assignments were suspended, except food service and UNICOR, which did not involve me. Only a very limited number of commissary items were available for purchase, about 1/3 of the normal list. All in-person visitations were suspended.

    Starting about March, 2021, the above conditions continued unchanged, with the exception that we were allowed to access the recreation and exercise facilities for about 2 1/2 hours a day. On August 9, 2021, a three-tiered, color-coded modified operations policy was introduced by the Bureau of Prisons. We remained at level "red" -- the highest level -- for quite

a while. Eventually this did provide for a very gradual partial reopening of programming opportunities, and a limited freedom of controlled movement on the compound. Finally, after about 18 months of total or partial lockdown, normal prison operations resumed in about September, 2021.

After being initially locked-down on April 2020, FCI Englewood was able to remain largely COVID-free until the autumn. In about October, 2020, COVID was introduced into the compound, reportedly by a staff member who worked in food service and had attended a political event where masks and social distancing were not utilized. It then spread to the housing units through inmate food service workers who, unfortunately, were not housed together but remained distributed throughout the housing units, providing vectors for the disease.

I contracted COVID in November, 2020, and became very sick for 2 1/2 weeks. No palliative medications at all were provided by the medical department; it was only possible to purchase over-the-counter pain relievers; Claritin-type products; and non-codeine, non-destromethorathan (DM) cough syrup that was ineffective. Every inmate at the FCI was infected with COVID and became very ill. Our entire range was infected at about the same time, and the living conditions were horrific. At the peak of my illness, I woke up in the middle of the an already sleep-disturbed night feeling an intense pain in my sinuses that felt like a red-hot poker had been shoved against them. The pain passed after a couple of hours, but

afterward I had no sense of smell or taste for over two years as a result of "long COVID." Fortunately, these senses have now returned.

I was reinfected with a less-virulent strain of COVID in 2022, and the illness lasted a shorter time, about 10 days. We were eventually vaccinated, and when I contracted COVID a third time, it was even less severe, lasting about five days. Not all of these infections were diagnosed by the medical department because testing was infrequent and we were actively discouraged from going to sick call -- which had nothing to offer us anyway. No anti-viral drugs were ever made available to inmates, even though news reports and statements by members of Congress said they were made available to the BOP. Finally, in the spring of 2024, several waves of RSV respiratory virus spread through FCI Englewood, giving everyone on the compound including myself, flu-like symptoms, difficulty breathing, chills, fever, and body aches.

In conclusion, these conditions of incarceration were severe and included onerous lockdowns, as well as the curtailment of facility programming and visitation. The outbreaks were made worse by the impossibility of social distancing in a prison setting, which left myself and other inmates fearful of repeated serious illness and potentially permanent health problems due to long COVID, both of which happened to me. The fear of death was never far from our minds as other inmates were dying around us. As a result, the actual conditions of my confinement during this 18-month period were far harsher

- 14 -

and more punitive than the District Court anticipated when it committed me to the custody of the Bureau of Prisons. These conditions of confinement therefore weigh heavily in favor of finding extraordinary and compelling reasons for a sentence reduction when considered together with the other reasons set forth in this request.

(7) Release Plan

   (a) Residence. If this motion is granted, I will first reside at a separate residence on the property of my former brother-in-law, D.M., at Richmond, Maine 04357. This residence has already been visited and approved by the Portland office of Probation and Parole. I plan, however, to immediately seek an apartment in Portland, Maine due to its proximity to my planned employment and other resources. I have contacted a faith-based organization, The Transformation Project, that is a member of the national Community Reentry Network (CRN). The Transformation Project is located at 907 Main St., Westbrook, Maine 04092 (email: info@ttpmaine.org, telephone: (207) 854-2226), and spoken with the Director, who said that there would be no problem with me finding housing in Portland because they had various housing options available for former inmates.

   (b) Employment. I plan to work in my previous career field. I will immediately begin work as a legal assistant/paralegal, and will eventually seek reinstatement to the Bar

- 15 -

as a licensed attorney. Attorney Peter Rodway of Rodway & Horodyski, Falmouth, Maine (telephone: (207) 773-8449) has committed to use my services immediately upon release in various retained and court-appointed cases. In so doing, I would receive compensation both directly from Rodway & Horodyski in retained cases, and from the U.S. District Court in cases where Mr. Rodway is appointed to represent indigent defendants under the Criminal Justice Act (CJA). This part-time work would involve document review, legal research, and investigations.

In addition, because of the entrepreneurial experience I had prior to my incarceration (described in my Presentence Report), I have been offered a unique and lucrative contract with a corporate client of Rodway & Horodyski, where I will provide business start-up services and then act as General Manager of Sales, Marketing, and Product Development afterward. The contract provides for an initial fee for business set-up, and ongoing compensation once the business is ready to sell its products. The initial compensation is payable at a rate of $800 per week for four months, and then once sales commence, compensation at a higher rate plus bonuses and equity participation. This company wishes me to start work as soon as possible. They are fully aware of my history and the nature of my conviction, as well as my future conditions of release and that my business internet use would be monitored by the U.S. Department of Probation and Parole. Although they are disappointed that I am not immediately available, they are willing to delay the start of my contract until I am available to work while

on conditional release. I am nevertheless concerned that a delay of my release to probation supervision will eventually jeopardize this opportunity, as my continuing incarceration is delaying their planned business rollout.

I will therefore have immediate full-time employment upon the granting of this motion, plus the ability to earn additional income from legal work on a part-time basis.

(c) Budget. For the first month, I can expect a gross income of $3,467 per month ($800/week), increasing in subsequent months as payment for my legal work begins. This will be a net starting income of about $2,600/month after taxes. I estimate my rent will be about $1,300 per month at most. This will leave me with about the same amount, $1,300 per month, for food, health insurance, and other expenses. In addition, my brother T.C. has agreed to provide me with extra financial support as needed until I receive my first paychecks.

(d) Social Support. I have already been in contact with a church in Portland, Williston-Immanuel Church, 156 High Street, Portland, Maine (telephone: (207) 775-2301), and Rev. Reba Delzell has welcomed me to worship with her congregation in full knowledge of my conviction. I look forward to participating in this new faith community.

(e) <u>Caring For My Son</u>

Care for my son will take place primarily at my apartment in Portland where I will provide him with his own bedroom where he can feel comfortable for day and overnight visits. At first, my ex-wife B.C., her sister N.C.,

and my ex-brother-in-law D.M. will provide transportation for D.C. from Hallowell to my residence in Portland. All three have many interests in Portland, and dropping D.C. off for the day or the weekend will not be a burden on them. Furthermore, it is to D.C.'s advantage to spend time in Portland where there are many diversions that we hope will interest him and motivate him to get out of the house, which is a constant concern of ours and many parents of persons with Autism. If it is decided that some caregiving at B.C. and D.C's residence in Hallowell is desirable, I will immediately purchase a car and travel to her house as needed.

(8) Conclusion

   My extraordinary and compelling circumstances should result in a sentence reduction to time served. These circumstances are based on a combination of my family situation relating to the care of my adult son D.C., who has Autism and OCD; my rehabilitation; and the conditions of incarceration I experienced at FCI Englewood during the COVID pandemic, which were far harsher and more punitive than the District Court anticipated at my sentencing. I am requesting an approximately 10-month reduction, less than 6% of my total 196-month sentence. The fact that I have a unique and valuable job opportunity with a corporate client of Rodway & Horodyski adds to the merits of this request. SInce the sentence only affects my contempt of court conviction, no undue disparity would result from my early release -- my child pornography sentence has been

- 18 -

fully served. My risk of recidivism is "minimum" based on the BOP's own diagnostic tool. My son D.C. and my ex-wife desperately need my help in caring for him. It would be a greatly appreciated act of compassion to release me at the earliest opportunity.

6/5/2024
DATE

James M. Cameron
Reg. No. 11343-036
FCI Englewood
9595 W. Quincy Avenue
Littleton, CO  80123

INMATE UNSWORN DECLARATION

I, James M. Cameron, declare under penalty of perjury, that the foregoing is true and correct.

6/5/2024
DATE

James M. Cameron